I hereby attest and certify on 10-30-12 that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DEPUTY CLERK



ENT JS-6

1169

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>ARTHUR JOHN PATTERSON,<br><br>A Fugitive from the Republic of Korea. | Case No. CV 11-5459 ODW (MRW)<br><br>STATEMENT OF CERTIFICATION OF EXTRADITION |

## I. INTRODUCTION

The United States requests that the Court certify to the Secretary of State that Arthur Patterson is extraditable to the Republic of Korea (ROK or South Korea) to face criminal prosecution in that nation. After reviewing the parties' voluminous filings and conducting a series of hearings in this case, the Court certifies that the elements of extradition are met and that Patterson is extraditable to South Korea.

## II. FACTS AND PROCEDURAL HISTORY OF ACTION

This extradition case involves a killing in South Korea in 1997. At the time, Patterson was the 17-year-old son of an American serviceman stationed in South Korea. According to the extradition request, the victim was stabbed to death in a restroom of a fast food restaurant. Patterson and a friend, Edward Lee, were in the restaurant that night. They followed the victim into the restroom and exited shortly after the killing. Both were covered in blood, although the extradition request asserts that Patterson's clothing was considerably more blood-soaked. A knife belonging to Patterson – that both Lee and Patterson handled on the night of the killing – was the murder weapon. Patterson took the knife from the scene of the killing and disposed of it. Additionally, Patterson made statements to witnesses after the killing in which he admitted killing the victim. (Docket # 31 at 8-10.)

Patterson and Lee each accused the other of actually stabbing the victim. The South Korean government initially prosecuted Lee for the murder in 1997. Lee was convicted. However, the conviction was overturned on appeal. The South Koreans again prosecuted Lee for murder in 1998; Lee was acquitted of the offense after the second trial. Meanwhile, Patterson was tried and convicted of a less severe charge of destruction of evidence for his role in the incident. (Docket # 66 at 17-19.) Patterson was sentenced to a term of 12 to 18 months in custody, although he was ultimately released from prison on a "special pardon." (Id. at 19.)

In 1999, after Lee's second murder trial and Patterson's release from custody, Patterson left South Korea and returned to the United States.[1] In 2009 –

---

[1] Patterson faced conflicting demands from (a) Korean immigration officials who ordered him to exit the country and (b) Korean prosecutors who required Patterson to stay during the continued investigation of the killing. However, in 1999, the prosecutors failed to renew the "travel ban" that would have required Patterson to remain in South Korea. (Docket # 64, Ex. 101, 108, 120

(continued...)

2

approximately 10 years after Patterson left South Korea and 12 years after the killing – Korean prosecutors sought an arrest warrant for Patterson. The defense argues that the Korean government applied for the warrant in the long-dormant case because of unflattering publicity about the South Korean prosecutors after the release of a movie about the killing. (Docket # 66 at 12.) The South Korean authorities subsequently made an extradition request to the United States government. In early 2011, the U.S. Attorney in this district sought a provisional arrest warrant based on the extradition request. Patterson was arrested in May 2011. He has remained in federal custody since that time.[2]

### III. CERTIFICATION PROCEEDING

There are five findings that this Court must make in order to certify an individual for extradition. They are:

> (1) the extradition magistrate has jurisdiction to conduct the extradition proceedings;
>
> (2) the extradition magistrate has jurisdiction over the fugitive;
>
> (3) an extradition treaty is in full force and effect;
>
> (4) the crime is one for which extradition is permitted under the treaty; and

---

[1](...continued)
(travel ban documents).) As a result, Patterson apparently complied with the instructions of Korean immigration authorities to leave the country. On the basis of the evidence presented in this proceeding and the fact that the Korean prosecutors did not file charges for another 10 years, the Court finds that Patterson was not a fugitive who fled from South Korea to avoid prosecution.

[2] The Court previously concluded that the excessive delay in prosecuting this action constituted a "special circumstance" in the extradition context that warranted Patterson's release on conditions. (Docket # 78.) The government appealed that decision to District Judge Wright, who reversed the Court's bail determination. (Docket # 82.)

>   (5) there is probable cause to believe that the individual committed the crimes alleged by the requesting nation.

Barapind v. Reno, 225 F.3d 1100, 1105 (9th Cir. 2000).

In addition, the Court "must also assess whether any of the applicable treaty provisions bar extradition" or if some other defense to extradition exists. Id. "Once a federal court has completed its extradition determinations under 18 U.S.C. § 1318, the Secretary of State in her discretion may determine whether the alien should be surrendered to the custody of the requesting state. We have long held that it is the Secretary's role, not the courts', to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." Trinidad y Garcia v. Thomas, 683 F.3d 952, 960 (9th Cir. 2012) (Thomas, J., concurring) (quotation and citation omitted).

In the present case, Patterson does not contest the first four certification conditions. (Docket # 66.) The Court therefore concludes that those conditions are satisfied. This Court has jurisdiction to conduct the extradition certification proceeding under 18 U.S.C. § 3184 and General Order 05-07 (Finding # 1). This Court also has jurisdiction over Patterson, who was arrested within this judicial district (Finding # 2). According to a sworn statement from an attorney at the State Department, the operative treaty between the United States and South Korea is in force and governs the Korean government's request (Finding # 3). (Docket # 32 at 5-7.) The crime charged in South Korea – murder – is an extraditable offense because it is substantially similar to offenses under federal (18 U.S.C. § 1111) and California (Cal. Penal C. § 187) law (Finding # 4).[3]

---

[3] The Court separately sets forth its further analysis of the gradation of the murder charge in the section of this decision regarding probable cause (§ III.C. (continued...)

* * *

Patterson's opposition focuses on the interplay of the prior criminal proceedings in South Korea, the delay in seeking Patterson's extradition from the United States, and the unique nature of the extradition treaty and a related agreement governing American military personnel and their dependants stationed in South Korea. He also contests that the evidence presented in the Korean extradition request is sufficient to satisfy the probable cause standard. However, given the specific nature of the treaty and this Court's limited jurisdiction at this stage of an extradition proceeding, Patterson's arguments are insufficient to prevent certification to the State Department.[4]

---

[3](...continued)
below).

[4] Patterson further claims that the South Korean extradition request was motivated for a "political purpose" (to protect reputations of the Korean prosecutors after their unsuccessful cases against co-defendant Lee), which is expressly prohibited under the treaty. (Docket # 66 at 55.) Yet, Patterson is not a public figure in Korea, and the extradition charges do not relate to issues of expression, speech, public debate, or politics in that nation. Patterson offers no authority for the proposition that the indirect political pressure on or gains to a local prosecutor make this extradition one requested for "political purposes." Further, Patterson fails to convince the Court that his circumstance is analogous to those of individuals who reasonably fear torture upon extradition to the requesting nation, which implicates broader treaty and federal statutory protections not applicable here.

5

### A. Statute of Limitations

Patterson contends that the South Korean murder charge against him is most analogous either to a charge of conspiracy to commit murder or second degree murder. Because the Korean government brought its charge against Patterson well after the expiration of the limitations period for either offense under U.S. law, he argues that he cannot be extradited to face an untimely criminal charge.

The federal statute of limitations for murder depends upon the gradation of the offense and the maximum sentence attributable to the crime. First degree murder – which, under federal law, is potentially punishable by the death penalty – has no limitations period. 18 U.S.C. §§ 1111(b) (available sentences for murder conviction), 3281 ("An indictment for any offense punishable by death may be found at any time without limitation.") The statutory maximum sentence for either second degree murder or conspiracy to commit murder is life imprisonment. 18 U.S.C. §§ 1111(b), 1117. As a result, the statute of limitations for bringing such a charge under federal law is five years from the date of the crime. 18 U.S.C. § 3282(a).

In the present case, it is undisputed that the Korean prosecution of Patterson for murder began more than five years after the killing. From this, Patterson contends that he may only be extradited under the treaty if the Court finds that the underlying offense qualifies as first degree murder under American law.

However, the plain text of the treaty and the direct holdings of several recent Ninth Circuit decisions refute Patterson's claim. Article 6 of the U.S.-ROK treaty (entitled "Lapse of Time") states that "[e]xtradition <u>may</u> be denied under this Treaty when the prosecution [ ] of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State[.]" (Docket # 31 at 15) (emphasis added). The use of the word "may" means that this exception to

6

extradition is "discretionary." Vo v. Benov, 447 F.3d 1235, 1246 n.13 (9th Cir. 2006) ("The use of 'may' language in a treaty indicates a provision constitutes a discretionary exception" to extradition.). In examining the significance of the use of the word "may" instead of the mandatory "shall" in a different treaty, the Vo Court concluded that a person who falls into a discretionary exception to extradition "can still be extradited if the Secretary of State so decides." Id. at 1246. However, "the magistrate must certify an individual [as extraditable] even though he may be subject to a discretionary exception." Id.

Similarly, in Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005), the relevant treaty stated that the requested nation "may refuse extradition" in the event that the offense involved the potential application of the death penalty in the requesting nation. The Ninth Circuit determined that the treaty "clearly provides that the executive branch holds the authority for determining extradition," and that, assuming all other elements of extradition were found, the court "must certify the individual as extraditable" without analyzing the discretionary exception to extradition in the treaty. Prasoprat, 421 F.3d at 1014 (emphasis in original); see also Blaxland v. Commonweath Dir. of Pub. Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003) ("Once a magistrate judge confirms that an individual is extraditable, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive.").

The language used in the lapse-of-time provision of the U.S.-ROK treaty is identical to that used in the Vo and Prasoprat cases. With the use of the word "may," the treaty expressly creates a discretionary exception to extradition reserved to the executive branch of government. In his surreply, Patterson urges the Court to find ambiguity in the treaty's language, the legislative history regarding the Senate's adoption, and statements by Korean officials. However, given the clarity of the language in Article 6, there is no need to turn to supporting

materials to interpret its obvious meaning. The treaty provision does not "suggest[ ] that denial of extradition is mandatory when certain conditions" do or do not apply. (Docket # 89 at 4.) Rather, the treaty specifically uses a term that, according to binding Ninth Circuit precedent, unambiguously shifts evaluation of a lapse-of-time argument to the discretionary authority of the Secretary of State. The Court cannot rewrite the treaty to turn this into a mandatory condition that would require denial of extradition. The Court therefore finds that extradition would not violate the lapse-of-time provision of this treaty regardless of the specific gradation of the murder charge.

### B. Status of Forces Agreement

As the dependent of an American serviceman stationed in South Korea, Patterson is and will be entitled to the protections of a Status of Forces Agreement (SOFA) between the two nations.[5] The SOFA and its "agreed minutes" (described in the government's filing as further agreements between the parties) contain express guarantees of an accused's entitlement to a speedy trial and to avoid being tried twice for the same offense. Patterson contends that he cannot be extradited from the United States because the lengthy delay between the crime and the extradition request violates the SOFA promise of a speedy trial. He further argues that his previous conviction for evidence destruction (which, he states, included a finding under Korean law that he destroyed evidence of his co-defendant's crime) bars trial on the pending murder charge based on the SOFA double jeopardy prohibition.

---

[5] The government originally argued that Patterson does not currently have "SOFA status" because he is no longer a dependent of his father. However, in its most recent filing, the government withdrew that contention. (Docket # 83 at 12-13 n.2.) For this reason, the Court presumes that Patterson falls within the terms of the SOFA.

8

Patterson's reliance on the terms of the SOFA cannot serve as a defense to certification of extradition in this Court. An American citizen accused of a crime in a foreign country cannot resist extradition to that nation on the ground that the foreign nation's justice system does not respect all of the rights accorded under our Constitution. See, e.g., Neely v. Henkel, 180 U.S. 109, 123 (1901) (cited in Munaf v. Geren, 553 U.S. 674, 697 (2008)). Further, the SOFA – an agreement between the United States and South Korea to implement the nations' treaty – does not give rise to any substantive rights in an American court. Rather, the agreement itself sets forth the procedures that each party's governing authority will implement in the prosecution of Americans in Korean courts for crimes committed there. Article XXVIII of the SOFA expressly states that a "Joint Committee" of American and Korean government representatives serves as the exclusive body through which disputes under the SOFA are to be adjudicated.[6]

---

[6]

1. A Joint Committee shall be established as the means for consultation between the Government of the United States and the Government of the Republic of Korea on all matters requiring mutual consultation regarding the implementation of this Agreement except where otherwise provided[.]

2. The Joint Committee shall be composed of a representative of the Government of the United States and the Government of the Republic of Korea[.] The Joint Committee shall determine its own procedures, [and] arrange for such auxiliary organs and administrative services as may be required.

3. If the Joint Committee is unable to resolve any matter, it shall refer that matter to the respective

(continued...)

In this way, the U.S.-ROK SOFA appears to operate in a manner virtually identical to the SOFA covering NATO forces as described in Matter of Burt, 737 F.2d 1477 (7th Cir. 1984), and Holmes v. Laird, 459 F.2d 1211 (D.C. Cir. 1972). In both cases, U.S. servicemen sought to defeat extradition by relying on speedy trial and other rights protected in the agreement with the host nations. However, in neither case did the individual's SOFA-guaranteed rights serve as a defense to extradition. The Holmes Court determined that the NATO SOFA called upon the "Contracting Parties" to negotiate disputes "relating to the interpretation or application of this Agreement," including the assertion of criminal justice rights. Holmes, 459 F.2d at 1222. From this, the court concluded that "the enforcement mechanism" under which the soldiers could assert their SOFA rights was "diplomatic recourse only" as provided by the agreement itself; "In sum, intervention by an American court into the matters of which appellants complain is foreclosed by the very terms of the document from which the rights insisted upon are said to spring." Id.

Similarly, in Burt, a soldier seeking to avoid extradition argued that a West German prosecutor's delay in filing charges against him constituted a violation of the governing agreement. However, the SOFA provision "governs the actions of the prosecuting state, which here is West Germany (the receiving state), and not the United States." Burt, 737 F.2d at 1487. As such, any infringement by

---

[6](...continued)
    Governments for further consideration through
    appropriate channels.

(Docket # 83-2 at 3 (emphasis added).) Additionally, U.S. military justice officials in Korea may contact their Korean law enforcement counterparts to resolve disputes before elevating a matter to the Joint Committee. (Docket # 83-2 at 2 (amendment to agreed minutes).)

10

the German government did not give rise to a right to relief "enforceable by the United States courts" Id. at 1488. If the German extradition request violated the NATO SOFA, "it is well settled that the recourse for such a treaty violation in these circumstances is diplomatic, not judicial." Id.

Neither the parties nor the Court have discovered any judicial decisions interpreting the U.S-ROK SOFA at issue in this matter. Additionally, the out-of-circuit Holmes and Burt decisions are not binding precedent on this Court. Nevertheless, the sense of those decisions is entirely consistent with the limited role that the judicial branch plays in the extradition certification process. If the United States had not entered into the SOFA, Patterson could not defeat extradition by asserting in an American court that the Korean prosecution would violate his constitutional rights. Having entered into the SOFA, though, and providing for beneficial treatment of its personnel accused of crimes in South Korea, the U.S. government committed to a specific "enforcement mechanism" – the Joint Committee – but not to federal court review.[7] The Court cannot interfere with this diplomatic concession by blocking extradition on that basis. The SOFA does not

---

[7] The Court notes that American forces in Korea are informed that, even under the provisions of the SOFA, "U.S. constitutional rights do not apply to Korean criminal trials." Instead, the rights that service members have under the SOFA (speedy trial, right to counsel, etc.) "are interpreted in light of Korean law and practice." See US Forces-Korea, "The SOFA and You," www.usfk.mil/usfk/sofa.the.sofa.and.you.360 (accessed Oct. 18, 2012).

Nevertheless, the military affirmatively advises its personnel that American officials will attend Korean criminal trials "to ensure that the service member receives all the procedural safeguards to which he/she is entitled. The Department of Defense and the Department of State will be notified where it appears that the service member's SOFA rights are not being granted." Id.

entitle Patterson to assert these rights in an American court in order to defeat extradition.

### C.  **Probable Cause and Gradation of Murder Charge**

Patterson contends that there is insufficient evidence to show probable cause that he committed the charged offense.  At the hearing regarding certification, Patterson's attorney directly asked that, if the Court was inclined to find probable cause, it specifically certify whether Patterson is extraditable under a particular gradation of murder.  The Court recognizes that its analysis of probable cause may impact the Secretary of State's evaluation of the case, later proceedings in federal court, and, potentially, the intended criminal action in South Korea.  For these reason, the Court concludes that it is appropriate to give consideration to the various murder theories alleged in the parties' papers.

Overall, the Court has little difficulty in finding probable cause to support Patterson's extradition on a murder charge equivalent to second degree murder under federal law.  In assessing probable cause, a court must consider whether the facts and circumstances alleged would warrant "a prudent man in believing that the petitioner had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964).  The evidence set forth in the extradition request – Patterson's presence in the restaurant, his entry into the bathroom following the victim, proof that he emerged from the bathroom covered in blood after the victim was killed, the victim's DNA on his knife, and Patterson's post-incident statements regarding the killing – is more than sufficient to establish probable cause that Patterson directly participated in the murder.  Specifically, the evidence is sufficient for the Court to find probable cause that Patterson unlawfully killed the victim with malice aforethought, which means "to kill either deliberately and intentionally or recklessly with extreme disregard for human life."  Ninth Circuit Model Criminal Jury Instruction No. 8.108 (2010 ed.); 18 U.S.C. § 1111(a).  The evidence

demonstrates that the killing was not accidental, provoked by the victim, or based on any act of self-defense. To that end, the Court concludes that there is probable cause to conclude that the analogous criminal charge under federal law is second degree murder under 18 U.S.C. § 1111(a).

Additionally, to the extent that the Korean charges allege that Patterson aided and abetted Lee in committing the murder, there is adequate evidence to support such a charge.[8] The government presented evidence that Lee and Patterson spent the evening of the crime together, previously discussed committing crimes (such as "robbing drunks"), and followed the victim into the bathroom. Tellingly, the evidence suggests that Lee openly took Patterson's knife when he told Patterson to follow him into the bathroom before the killing. After the stabbing, Patterson and Lee immediately left the restaurant to clean up and destroy or hide the evidence of the crime. Neither man contacted law enforcement or sought medical treatment for the victim, which suggests that they acted jointly and with some level of shared criminal intent. That is sufficient to establish probable cause that Patterson aided and abetted Lee in the murder. See Ninth Circuit Model Criminal Jury Instruction No. 5.1 (2010 ed.) (elements of aiding and abetting liability include proof that defendant "acted with the knowledge and intention of helping" principal commit charged crime).

The government further contends that there is probable cause to extradite Patterson for first degree murder. The key distinction between first degree and

---

[8] In its reply, the government disavows advancing a "murder conspiracy" theory of prosecution under the Korean indictment. (Docket # 83 at 6.) Instead, the government broadly explains that, despite a reference to a Korean conspiracy statute, the Korean indictment was intended to articulate vicarious theories of culpability for the murder. Based on this statement, the Court will not certify that there is probable cause to extradite Patterson on a murder conspiracy theory.

13

second degree murder under the federal criminal code is the element of premeditation, which is synonymous with planning or acting in a considered manner.[9] Ninth Circuit Model Criminal Jury Instruction No. 8.107 (2010 ed.) ("Premeditation means with planning or deliberation. The amount of time needed for premeditation [ ] must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing."). Circumstantial evidence of "the defendant's prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing" may be sufficient to establish premeditation. United States v. Begay, 673 F.3d 1038, 1042-43 (9th Cir. 2011) (en banc) (citing Model Instruction).

In the present case, the Korean request does not contain sufficient evidence from which the Court may plausibly or prudently find probable cause that Patterson acted in a premeditated manner. The evidence establishes that neither Patterson nor Lee had any preexisting relationship with the victim. This seemingly random "thrill kill" was not initiated by any motive or specific animus against the victim. As a result, there is no proof that Patterson had any long-running plan to kill this individual.

At most, then, as the government acknowledges, Patterson could only have formed a premeditated intent to kill the victim in the short period between when he and Lee left their table and entered the bathroom to stab the victim. Yet, there is no evidence from which the Court could conclude that Patterson actually <u>did</u> form

---

[9] The government does not contend that Patterson killed the victim under any of the other prescribed conditions in the statute (by poison, lying in wait, or in the course of a listed serious felony) that transform a murder from second degree to first degree under the federal code. 18 U.S.C. § 1111(a) (listing qualifying circumstances for first degree murder; "Any other murder is murder in the second degree.").

14

a plan to kill. The Korean evidentiary submission reveals no statement or action – other than following the knife-wielding Lee – from which the Court could fairly find probable cause that Patterson acted in a premeditated manner by which he "considered the killing."

Further, the brutal circumstances of the actual killing (described by the government as a series of knife wounds delivered to the victim's upper body) suggest a chaotic and ill-planned killing. Had the victim been killed by a single, fatal stab wound to the chest or throat, the government would have been on firmer footing to argue that the murder was planned (first degree) rather than merely deliberate and intentional (second degree). Similarly, the amateurish killing in a public facility – which required the blood-covered Patterson and Lee to run through a restaurant – and the haphazard and unsuccessful way by which they disposed of the evidence cannot lead the Court to conclude that the event was premeditated. Simply stated, the evidence is adequate to lead a prudent person to believe that the killing was deliberate (murder two), but not planned or premeditated (murder one).[10]

---

[10] The government makes a spirited attempt to equate the circumstances of the Begay case and the present action. However, the Court concludes that the evidence of actual premeditation and cool-mindedness in Begay far exceeded that regarding Patterson's conduct. Specifically, Begay confronted his victims, walked directly back to his truck, took out a weapon, and returned to the victims' vehicle to kill them. Begay, 673 F.3d at 1043-44. Here, however, the evidence suggests that Patterson took the knife from Lee near or in the bathroom immediately before the killing. Although there may have been an instantaneous amount of time for Patterson to plan his attack on the victim (as may occur in any non-accidental killing), there is no proof that he actually engaged in that level of premeditation in the manner that Begay did.

(continued...)

The government contends that the Court must determine – whether for certification or limitation of action reasons – that there is probable cause to believe that Patterson committed first degree murder. The government points to a statement by the Ninth Circuit in Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1986) (Kennedy, J.), in which the appellate court declared that, "at least for purposes of international extradition from the United States, murder is a capital offense falling under 18 U.S.C. § 3281 [no statute of limitations] rather than 18 U.S.C. § 3282 [5-year limitations period]." The sole citation supporting that rationale was to Quinn v. Robinson, 783 F.2d 776, 816 (9th Cir. 1986), in which the court stated that [n]either the United States nor the United Kingdom imposes a statute of limitations on murder charges." Since the issuance of the Kraiselburd decision over 25 years ago, no Ninth Circuit decision (published or unpublished, according to the Court's research) has cited either Kraiselburd or Quinn for the proposition that all murder extradition cases are capital crimes classified as first degree murder, whether for limitation of actions purpose or otherwise.

The statement in Quinn – that there is no statute of limitations for any murder charge under U.S. law – is clearly wrong. See 18 U.S.C. §§ 1111, 3281. Indeed, the Ninth Circuit recently analyzed whether murder allegations fell within the ambit of first or second degree murder under Section 1111 in the context of the statute of limitations (United States v. Gallaher, 624 F.3d 934 (9th Cir. 2010)) and

---

[10](...continued)
Further, Begay "walked both ways between his truck and [the victims'] car," and did not appear to be "agitated or rushed" either before or after the killing. Id. at 1044. By contrast, Patterson's awkward run through the restaurant after the killing demonstrates that he was not "acting with a cool mind" in a manner such that a reasonably prudent person would find premeditation or planning. Id.

16

sufficiency of the evidence of the premeditation element (Begay) under federal law. In both situations, the Ninth Circuit made clear that a federal court may appropriately inquire into the nature of the charge and the adequacy of the evidence supporting the elements of the offense to distinguish between gradations of the homicide charge. See Gallaher, 624 F.3d at 941 ("The plain text of § 1111(b) mandates that we continue to categorize first degree murder as a crime punishable by death" and subject to indefinite limitations period); Clarey v. Gregg, 138 F.3d 764 (9th Cir. 1998) (distinguishing between felony murder (a form of first degree murder) and manslaughter in Mexican extradition evaluation).

The government correctly states that the Ninth Circuit has not expressly or directly overruled the Kraiselburd statement that there is no statute of limitations in an extradition case involving murder. Even so, based on the genesis of that statement in that decision, the flawed statement of law underlying it, and the subsequent development of the Circuit's law in this area, the Court believes it is on safe ground in evaluating whether there is probable cause to certify Patterson on a first degree murder charge. Because there is insufficient evidence of premeditation, the Court declines to do so. Instead, because there is probable cause to believe that Patterson committed or aided and abetted second degree murder (Finding # 5), the Court certifies him for extradition on that basis.

## IV. CONCLUSION

Patterson's experienced attorney explained to the Court that Patterson will likely pursue habeas relief in the next phase of his opposition to extradition. At some point, though, the matter will be presented to the Secretary of State for consideration. In evaluating whether to extradite Mr. Patterson, the Secretary will be asked to consider the Korean government's excessive and unexplained delay in reopening this homicide case. Patterson persuasively argues that defending the case in a foreign nation after the passage of so many years raises serious questions

of fair play and justice. Such a delay may serve as an equitable basis for the executive to decline extradition. See Man-Seok Choe v. Torres, 525 F.3d 733, 741-42 (9th Cir. 2008) ("To the extent there was a delay [in an extradition request], this is a matter left for the Secretary of State's consideration.").

Balanced against this, though, is the rather extraordinary level of diligence and oversight that the South Korean courts have demonstrated in the prosecutions of co-defendant Lee. Lee – Patterson's American colleague who was originally convicted of murdering a Korean victim – was ultimately freed from custody by the Korean court system. The U.S. government is entitled to consider whether a foreign court will demonstrate "proper concern for correctness of procedure and for the assurance of a fair and impartial trial for all the defendants" in making its discretionary decision regarding extradition. Williams v. Rogers, 449 F.2d 513, 521 (8th Cir. 1971). Ultimately, and with no small amount of irony, Patterson's best venue in which to present his complaints of delay and prosecutorial misconduct may be in the Korean court system that provided relief to Lee earlier in the action.

None of these political, diplomatic, or legal issues is before this Court, though. The direct question is whether the extradition request satisfies federal law and the governing treaty in a manner that requires certification to the State Department. The answer to that question is "yes," so the Court must certify Mr. Patterson as extraditable in this matter.

DATE: October 30, 2012

_____
HON. MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

1167